1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

RAYMUNDO QUEZADA,

Civil No.    13cv2961-GPC (DHB)

12

Petitioner,

13

vs.

14

MARTIN BITER, Warden, et al.,

15

Respondents.

**REPORT AND RECOMMENDATI
ON OF UNITED STATES
MAGISTRATE JUDGE RE
DENIAL OF FIRST AMENDED
PETITION FOR A WRIT OF
HABEAS CORPUS**

16
17       This Report and Recommendation is submitted to United States District Judge

18   Gonzalo P. Curiel pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the

19   United States District Court for the Southern District of California.

**I.**

20
21

**FEDERAL PROCEEDINGS**

22       Raymundo Quezada (hereinafter "Petitioner"), is a California prisoner proceeding

23   pro se with a First Amended Petition for a Writ of Habeas Corpus pursuant to

24   28 U.S.C. § 2254.  (ECF No. 4.)  He challenges his San Diego County Superior Court

25   convictions of two counts of kidnapping during a carjacking, and one count each of

26   evading an officer with reckless driving, being a felon in possession of a firearm, and

27   allowing a concealed firearm in a vehicle, along with jury findings that he was

28   vicariously liable for his co-defendant's use of a handgun.  (First Amended Petition

["FAP"] at 1-2.)   Petitioner claims here, as he did in state court, that his federal Constitutional rights were violated because: (1) there is insufficient evidence to support the kidnapping during a carjacking convictions because there was no evidence the kidnappings facilitated the carjacking; (2) the jury was not instructed on the lesser included offense of simple kidnapping; (3) the jury was not instructed that kidnapping during a carjacking requires that the kidnapping must facilitate the carjacking, and is not committed if the carjacking is merely incidental to the kidnapping; and (4) the jury was not given a unanimity instruction regarding the gun possession crimes and gun use allegations.  (FAP 6-9, 34-71, 94-112.[1])

Respondent has filed an Answer with an attached Memorandum of Points and Authorities in Support, and has lodged portions of the state court record.  (ECF Nos. 12-13.)  Respondent contends that habeas relief is unavailable because Claims 2-4 do not present federal claims, and because the adjudication of all claims by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  (Memorandum of P&A in Support of Answer ["Ans. Mem."] at 19-40.)  Petitioner has not filed a Traverse.

For the following reasons, the Court **RECOMMENDS** habeas relief be **DENIED**.

## II.

## STATE PROCEEDINGS

In a five-count Second Amended Information filed in the San Diego County Superior Court on May 18, 2010, Petitioner and his co-defendants Rafael Ortiz and Gustavo Martinez were charged with two counts of kidnapping during a carjacking in violation of California Penal Code section 209.5 (counts one and two), and one count of evading an officer with reckless driving in violation of California Vehicle Code section 2800.2(a) (count three).  (Lodgment No. 2, Clerk's Tr. ["CT"] at 27-30.)  Petitioner alone was charged with one count of possession of a firearm by a felon in violation of Penal

---

[1] Citations to the First Amended Petition and the Answer are to pages assigned by the Court's Electronic Case Filing ("ECF") system.

Code section 12021(a)(1) (count four), and one count of allowing a concealed firearm to be carried in a vehicle in violation of Penal Code section 12025(a)(3) (count five).  (Id.)  The Information contained sentence enhancement allegations that Petitioner and Martinez personally used a handgun in the commission of counts one and two within the meaning of Penal Code section 12022.53(b), and that Ortiz was vicariously liable as a principal for the use of a firearm in the commission of counts one and two within the meaning of Penal Code section 12022(a)(1).[2]  (Id.)

All three co-defendants were tried together with a single jury.  On June 7, 2010, the jury returned guilty verdicts on all counts, and returned true findings on all sentence enhancement allegations.  (CT 554-61.)  On October 8, 2010, Petitioner was sentenced to life in prison plus four years.  (CT 567.)  His co-defendants also received life sentences.  (CT 235, 823.)

Petitioner and his co-defendants filed a consolidated appeal, presenting, *inter alia*, the same claims presented here.  (Lodgment Nos. 3-11.)  The appellate court, in a published opinion, affirmed in all respects.  People v. Ortiz, et al., 208 Cal.App.4th 1354 (Cal.Ct.App., Aug. 29, 2012).  All three co-defendants thereafter filed a consolidated petition for review in the state supreme court presenting, *inter alia*, the claims raised here.  (Lodgment Nos. 13-15.)  The petition was denied by an order which stated in full: "The petitions for review are denied."  (Lodgment No. 16, People v. Ortiz, No. S205790 (Cal. Dec. 13, 2012).)

### III.

### TRIAL PROCEEDINGS

Paul Fatta, the owner and manager of the Big Kahuna restaurant located on Ingraham Street in the Pacific Beach area of San Diego, testified that on Monday,

---

[2] The Second Amended Information was amended at the close of the prosecution's case-in-chief to allege that Petitioner was vicariously liable as a principal for the use of a firearm in the commission of counts one and two within the meaning of Penal Code section 12022(a)(1), rather than that he had personally used a gun within the meaning of Penal Code section 12022.53(b).  (CT 549.)

February 2, 2009, he looked out the front window of the restaurant and saw a black BMW with a man driving and a woman passenger pull up to the curb and park. (Lodgment No. 1, Reporter's Tr. ["RT"] at 1224-29.) The woman exited the BMW from the front passenger door onto the sidewalk in front of the restaurant, as if she intended to enter his restaurant or Rocky's restaurant next door. (RT 1227-29.) Fatta then saw three men walk across the sidewalk and surround the car; the man and woman in the BMW both looked terrified, and the woman was startled and jumped back when one of the men spoke to her. (RT 1230.) One of the three men grabbed the woman and pushed her into the front passenger seat of the BMW and followed her in; a second man pushed the driver over and got behind the wheel, so there were four people in front; the third man got in the back seat and they sped away. (RT 1233-36.) Fatta called 911 at 11:39 a.m. and reported a suspected carjacking; he told the operator that the BMW was traveling south on Ingraham Street toward Sea World and the entrance to Interstate 8, and described the men as Hispanic, wearing loose fitting clothing and hooded sweatshirts. (RT 1231, 1236-38, 1274-75.)

Elias Rodriguez, a Tactical Flight Officer with the Air Support Unit of the San Diego Police Department, testified that he was airborne on duty on February 2, 2009, about 11:40 a.m., and responded to a call of a possible carjacking. (RT 1250-53.) Rodriguez located a vehicle, which matched the description given by the 911 caller, about two or three minutes later at the intersection of Interstates 5 and 8; the vehicle was being followed by a police car driven by Officer Howard Spetter. (RT 1254-55.) Rodriguez testified that he observed the vehicle drive in an evasive manner; it exited Interstate 8 at the Hotel Circle South exit by cutting across two lanes abruptly, "blew a stop sign," and continued westbound on Hotel Circle South at a high rate of speed. (RT 1255.) It passed numerous vehicles and ran another stop sign as it reentered Interstate 8 eastbound. (Id.) The vehicle cut across the traffic lanes, cut off numerous cars, and narrowly missed a motorcycle, before it stopped on the left shoulder. (RT 1256.) Officer Rodriguez saw three people exit the vehicle and run across the westbound lanes of Interstate 8; the men

"amazingly made it across" the four or five traffic lanes.  (Id.)  A video taken from the helicopter camera, which included an audio recording of the police radio traffic, was played for the jury, and the jury was provided with a transcript of the recording, a copy of which is in the record.  (RT 1257-62; CT 164-89.)  Rodriguez saw the suspects removing articles of their clothing as they ran through the parking lot of a Motel 6, and he lost sight of them when they ran into a parking garage.  (RT 1263-66.)

Howard Spetter, a K-9 Officer with the San Diego Police Department, testified that he was in uniform driving a marked police car on February 2, 2009; he was parked at Perez Cove by Sea World off Ingraham Street giving his dog a bathroom break, when he received a dispatch of a possible carjacking.  (RT 1270-74, 1278-79.)  A short time later he observed a gray, four-door BMW with five occupants, which matched the description given in the dispatch, waiting at a traffic light on Ingraham Street.  (RT 1274-77.)  Officer Spetter followed the BMW, several cars back, without activating his siren or overhead lights, waiting for confirmation that he was following the suspect car; the BMW proceeded normally and entered eastbound Interstate 8.  (RT 1278-82.)  The BMW continued eastbound on Interstate 8; when it passed the exit ramp for Interstate 5, it began to drive evasively by changing lanes, slowing down, speeding up, and passing cars without apparent reason.  (RT 1284-86.)  At the last possible moment it abruptly took the Hotel Circle exit and Officer Spetter activated his overhead lights and siren; the BMW failed to stop for a stop sign at the end of the exit ramp; it proceeded westbound on Hotel Circle South, accelerating rapidly to over 90 miles an hour, driving in the opposite traffic lane and passing vehicles illegally, nearly hitting one.  (RT 1287-92.)  The BMW blew through another stop sign as it reentered Interstate 8, crossed all lanes of traffic, and stopped at the center divide.  (RT 1292-95.)  Just as Officer Spetter approached the car, three men exited, jumped the concrete divider, ran across the westbound lanes, and climbed over a fence.  (RT 1295-97.)  He ordered the remaining male occupant of the BMW out at gunpoint and handcuffed him; a second officer arrived and took custody of the female passenger.  (RT 1299-1300.)  The male passenger was terrified, and he told

Officer Spetter that the BMW belonged to him, that he had been the victim of a carjacking, and that there had been guns involved in the carjacking which had been thrown out of the car while they were on Hotel Circle just before they got back on the freeway. (RT 1305-07.) A stun gun was found in the back seat of the BMW. (RT 1315.)

Charles Lara, a San Diego Police Officer, testified that he was on patrol in uniform in the Hotel Circle area when he heard the dispatch of a suspected carjacking. (RT 1384-86.) He arrived at the Motel 6 and heard rustling sounds from the area of the San Diego River next to the parking lot. (RT 1386-92.) He saw three men walking northbound in the river through waist-deep to nipple-deep water, and identified them in court as Petitioner and his co-defendants Martinez and Ortiz; the parties stipulated that Petitioner, Martinez and Ortiz were the three men who were in the BMW, ran across the freeway, and were arrested coming out of the river. (RT 1360, 1393-94, 2249-51.) By the time the three men reached the parking lot numerous officers were on the scene; the three men were taken into custody and shown to the man and woman from the BMW at a curbside lineup. (RT 1395-1404.) Two baseball caps, a jacket with a one-hundred dollar bill in the pocket, and a pair of gloves, were recovered near the fence between the Motel 6 parking lot and the San Diego River. (RT 1804-12, 1884-1902.) A loaded 9-millimeter Glock handgun, an unloaded 9-millimeter Beretta handgun, several 9-millimeter bullets, and a damaged 9-millimeter Beretta ammunition clip, were recovered from the roadside along Hotel Circle South. (RT 1907-37.)

Silvia Arellano testified that on February 2, 2009, she lived in Chula Vista, just south of San Diego; she was a licensed attorney in Mexico and worked at her family's construction company in Tijuana as head of the legal department. (RT 1409-13.) She crossed the border every Monday through Friday to go to work using a Sentri Pass, which expedited the crossing for her as a United States citizen. (RT 1413.) She did not go to work on Monday, February 2, 2009, because it was a Mexican holiday. (RT 1414.) She was living with her boyfriend Joshua Castrillon at that time; she was twenty-nine and he was thirty-two; they had known each other since they were teenagers and had been living

together since 2006.  (RT 1414-17.)  She said Castrillon never had any money, which caused them to quarrel, and her wealthy parents did not like him.  (RT 1417-24, 1430.)  At that time Arellano owned two BMWs, a 2004 525 and a 2007 530, both registered to her; she drove the 2004, and Castrillon drove the 2007 and considered it his car, although she made the payments.  (RT 1420-22.)  She said Castrillon was part owner of a restaurant from 2006 to 2008; he sold his interest in the restaurant in 2008, and borrowed $15,000 from Arellano's mother to purchase a lunch truck, although she had never seen the truck.  (RT 1417-20, 1423-26, 1538.)  They stopped living together as a result of the February 2, 2009, incident, when she first learned that Castrillon was a drug dealer.  (RT 1427-31.)

Arellano testified that on February 2, 2009, she and Castrillon drove from their home in Chula Vista to the Pacific Beach area to have breakfast at Rocky's restaurant on Ingraham Street; they left about 10:30 a.m., and Castrillon drove them in the gray 2007 BMW.  (RT 1420-21, 1432-35.)  Castrillon pulled up in front of the Big Kahuna restaurant on Ingraham Street next to Rocky's and parked.  (RT 1437-38.)  As Arellano exited the BMW, a large SUV with tinted windows pulled in front of them, and three men came out and surrounded them.  (RT 1441-44.)  Two of the men closed her door, preventing her from exiting, and got into the back seat; they were wearing hooded sweatshirts with the hoods up even though it was a warm day, and she could see they were wearing gloves and had their hands in their pockets.  (RT 1445-46.)  The third man had a gun in his hand and opened the driver's door; he pushed Castrillon over, got behind the wheel, and made Castrillon get into the back seat with the other two men.  (RT 1447-49.)  As they drove down Ingraham Street toward Sea World, someone in the back seat asked Arellano to get her cell phone from her purse to make sure she did not call anyone.  (RT 1451-54.)  She could not find her cell phone in her purse but she gave them her i-Pad, which was on top of her purse, and they threw it out the window.  (RT 1454.)  Because they had told her to do as she was told, and she was afraid her cell phone might ring, she continued looking for her cell phone, but she could not find it quickly and

passed her purse to the back seat after she felt a sting on her shoulder and heard the clicking sound of a stun gun. (RT 1455-58.) She later identified the stun gun as the one found by the police in the back seat of the BMW, and said that a one-hundred dollar bill was missing from her purse. (RT 1461-63.)

Arellano said she saw a police car in the side view mirror following them as they drove down Ingraham Street to the freeway. (RT 1463-64.) She said Castrillon was very scared and asked the men what this was about. (RT 1466-68.) They entered the freeway with the police car following them without its lights or siren activated, and one of the men in the back seat was talking on a cell phone. (RT 1468-71.) The driver veered across the lanes and took the Hotel Circle exit very fast, which caused the police car to activate its lights and siren; the driver told Arellano to put her window down and he threw his gun out the passenger-side window. (RT 1471-77.) They were going about 90 miles an hour on Hotel Circle, passing cars and moving from one side of the street to the other, and then reentered the freeway. (RT 1477-79.) They drove across the lanes to the middle divider and stopped; the three men jumped out with the BMW still in gear and it rolled forward until Arellano put the transmission in park. (RT 1419-81.) The three men ran across the westbound lanes of the freeway toward the hotels, and she and Castrillon were detained and questioned. (RT 1481-86.)

In court, Arellano identified Petitioner as the man who was sitting directly behind her with the stun gun; she identified co-defendant Martinez as the man who was driving; and she identified co-defendant Ortiz as the man seated in the middle of the back seat next to Petitioner. (RT 1486-88.) At the curbside lineup she identified Petitioner as the man with the stun gun, but identified Ortiz as the man sitting directly behind her, and identified Martinez as the driver. (RT 1662-67.) At the preliminary hearing she said that Ortiz was directly behind her and used the stun gun on her, and Petitioner was seated in the middle of the back seat next to Ortiz. (RT 1522-24.) She said that Castrillon moved out of her house later that day after telling her that the incident was related to a problem of his; she never asked him the nature of the problem because she did not want to know

or become involved.  (RT 1496-97.)

A Motel 6 maintenance man saw three men run through the motel's parking lot chased by the police, and pointed out where two of the men had thrown their caps.  (RT 1940-42.)  The parties stipulated that:

> Joshua Castrillon was a drug dealer.  He had suffered a previous conviction for transportation and sale of marijuana in 1993. [¶] Sometime in November of 2008, Mr. Castrillon was involved in the organizing of a shipment of 600 pounds of marijuana from Mexico into San Diego.
>
> His partners in that venture were, among others, Arturo Galarza, A.K.A. Art, A.K.A. Chapo; Daniel Cital Jasso, A.K.A. Paisa, A.K.A. Negro; and Jose Alberto Ochoa, A.K.A. Junior.
>
> Mr. Castrillon had met Arturo Galarza at the Palomar Card Club on El Cajon Boulevard in San Diego in early 2008, and Mr. Galarza then introduced him, meaning Mr. Castrillon, to Daniel Jasso.
>
> Daniel Jasso was known to Joshua Castrillon to be affiliated with Teo, who is Teodoro Garcia Simental, a former lieutenant of a Mexican drug cartel.
>
> All parties further stipulate that the expected shipment of marijuana never arrived in San Diego.  As a result, pursuant to the rules of the drug trade, Mr. Castrillon, as the broker of the deal, was primarily responsible for its value, approximately $70,000 to $100,000.  Mr. Castrillon knew that his partners, Galarza and Jasso, were also being pressured to come up with that money.  Mr. Castrillon was fearful of what may happen to him if he did not come up with the money.  [¶] Though Mr. Castrillon had some property in Mexico that he had been trying to sell as of February 2, 2009, he had not been able to raise any money and had not made any payments towards the $70,000 to $100,000 that he owed for the missing marijuana.
>
> All parties further stipulate that on February 24, 2009, and then on February 26, 2009, respectively, Arturo Galarza and Daniel Jasso were arrested and charged as additional suspects in the alleged kidnapping of Joshua Castrillon and Silvia Arellano on February 2, 2009.
>
> All parties further stipulate that Joshua Castrillon continued to traffic in illegal narcotics after February 2, 2009.  On July 31, 2009, he was pulled over in the city of San Diego as part of an on-going narcotics investigation and found to have approximately one kilo of cocaine hidden in his vehicle.  When arrested, Joshua Castrillon admitted that he knew persons in the Tijuana drug trade; that he possessed the cocaine for sale; and that he intended to sell the cocaine for profit.

(RT 1987-88.)

James Brown, a San Diego Police Detective, testified that at the time of the incident the crime of kidnapping for ransom involving drug cartels had increased in San

Diego over the previous few years.  (RT 1996.)  When Detective Brown heard over the police radio that a car had been carjacked with passengers and then abandoned when the perpetrators ran, he suspected a carjacking with a kidnapping element.  (RT 2001.)  He and his partner responded to the Motel 6 parking lot, took control of the scene, supervised the collection of evidence, and observed the curbside lineup of the three suspects, who he identified in court as Petitioner and his co-defendants Martinez and Ortiz.  (RT 2004-08.)  None of the defendants' DNA or fingerprints were found on the guns recovered from the side of the road along Hotel Circle South.  (RT 2023-24.)  Detective Brown interviewed Castrillon and Arellano at the time of the incident, but neither of them gave him any leads on the reasons for the kidnapping; three days later, when confronted with evidence of his criminality, Castrillon told Detective Brown about his drug debt; Castrillon was an available witness but neither side called him at trial.  (RT 2026-30.)  Detective Brown said Castrillon led him to Galarza's house; the SUV used during the kidnapping and carjacking was parked outside, and police records indicated that there had been a traffic contact with Arturo Galarza while he was driving that vehicle.  (RT 2124-29.)  Detective Brown arrested Galarza and charged him with kidnapping during a carjacking as the driver of the SUV; his house was searched and one firearm, two pounds of marijuana, and one pound of cocaine were seized.  (RT 2031-34, 2339-41.)  Daniel Jasso was also arrested for kidnapping during a carjacking; a search of his house revealed three firearms and five pounds of marijuana.  (RT 2156-57, 2347, 2352.)  Galarza and Jasso both pled guilty prior to trial to simple kidnapping, and were each sentenced to thirteen years in prison.  (RT 3431.)  The People rested.  (RT 2301.)

The defense made a motion for acquittal on the two kidnapping during a carjacking counts, arguing, as Petitioner does here in Claim 1, that there was insufficient evidence the defendants had the specific intent to commit the kidnapping in order to facilitate the carjacking, because their sole intent in approaching the BMW was to kidnap its occupants, who just happened to be in a car.  (RT 2709-11.)  The trial judge denied the motion, finding sufficient evidence from which the jury could find that the kidnapping

was done with the specific intent to aid the defendants' escape by preventing the occupants from calling the police or sounding an alarm, thereby facilitating the carjacking.  (RT 2711-12.)

The defense called San Diego District Attorney Investigator Joseph Winney, who testified that he found "pay-owe slips" on the day of the incident in the center console of the BMW under Castrillon's wallet, and was suspicious of how Castrillon could own a newer model BMW and two cell phones from the income of a food truck.  (RT 2304-10.) Winney said Castrillon lied to him about his source of income, and that both Castrillon and Silvia Arellano declined Winney's offer of protective custody.  (RT 2309-11.)

John McGill, a San Diego Police Department Narcotics Detective, testified regarding the details of the arrests of Jasso and Galarza and the searches of their houses, and opined that Galarza's house was a "stash pad" for narcotics.  (RT 2337-49.)  Michael Messina, a criminal defense attorney who represented Petitioner at the preliminary hearing but was relieved due to medical issues, testified that Silvia Arellano did not break down and cry during her preliminary hearing testimony as she had done during her trial testimony.  (RT 2352-56.)

Juan Gomez, a San Diego Police Officer, testified that on July 31, 2009, he and his partner pulled Castrillon over for speeding as he was driving a newer model BMW which he said was registered to his girlfriend.  (RT 2358-61.)  They found 2.3 pounds of cocaine in his vehicle.  (RT 2364.)  Michael Rubio, a San Diego Police Detective, testified that he impounded the evidence collected during Castrillon's July 31, 2009 arrest, which included a kilogram of cocaine, $521 in United States currency, and a cell phone.  (RT 2379-80.)  John Tangredi, a detective with the Narcotics Section of the San Diego Police Department, testified that Castrillon's BMW was under surveillance just before it was stopped on July 31, 2009, and was coming from the Palomar Card Club on El Cajon Boulevard.  (RT 2383-87.)  Robert Newquest, a San Diego Police Detective, testified that Castrillon admitted that the cocaine found in his vehicle on July 31, 2009, was his and that he possessed it for sale.  (RT 2391.)

Karen Gold, an investigator with the Alternate Public Defender's Officer, testified that there were numerous telephone calls each day between Castrillon, Jasso and Galarza from December 1, 2008 to January 27, 2009, which abruptly stopped from January 27, 2009, to February 5, 2009, at which point they began again. (RT 2396-2410.) Marco Mercado, an investigator with the Cross-Border Violence Group of the San Diego Police Department, testified that he met with Castrillon and Arellano regarding the events of February 2, 2009, "to make sure that victims of the crime are protected and maintained safe throughout the course of the judicial proceedings." (RT 2413-14.) Mercado testified that Castrillon called him on July 31, 2009, during the traffic stop, informed Mercado that he had been stopped for speeding and the police were having trouble with his Mexican driver's license, and asked him to speak to the traffic officer who had pulled him over. (RT 2414.) Mercado spoke to the officer and asked the officer not to deport Castrillon, who was in the United States illegally, because Castrillon was a witness in the carjacking and kidnapping case, and it is difficult to locate witnesses in Mexico. (RT 2415.) Mercado at that time did not know about the drugs in Castrillon's car, and Castrillon called Mercado back a few minutes later and told him: "I have some shit in the car. And if I don't deliver it in 30 minutes, they're going to cut off my head and kill my family." (RT 2439.) Castrillon told Mercado that he was afraid to be booked into San Diego County jail because he might encounter the people who were responsible for the kidnapping and carjacking, so Mercado put together a "keep-separate order" to protect him. (RT 2416.) Mercado picked Castrillon and Arellano up at their home on the day of the preliminary hearing, took them to court, and drove them back home afterward; he said Arellano was scared and upset that day. (RT 2427-29.) Detective Brown was recalled and testified that Arellano did not break down crying during the preliminary hearing as she had during her trial testimony, and that she was more composed at the preliminary hearing than during trial. (RT 2432.) The defense rested and there was no rebuttal. (RT 2441.)

/ / /

Petitioner's trial counsel argued to the jury in closing that the kidnapping and carjacking was a ruse by Castrillon and Arellano, perhaps to extort money from Arellano's wealthy parents, or, alternately, it was a consensual drive to a location where Castrillon could give his partners the missing drugs or money, which was misinterpreted as a carjacking by the owner of the Big Kahuna restaurant, who never saw any guns, and in fact Arellano was the only person who testified that a gun was involved.  (RT 3012-24.)  Counsel argued that Castrillon dealt drugs before and after the incident, and that Arellano had lied when she said she did not know he was a drug dealer before the incident because she must have known he had been arrested in 1993 for felony drug dealing, and could have seen the pay-owe slips he kept in the BMW she owned.  (Id.) Counsel argued it was reasonable to find that Arellano was involved with Castrillon's drug dealing because she gave Castrillon, an undocumented Mexican drug dealer, a place to live in the United States, a car registered in her name equipped with an expedited border crossing Sentri card, and arranged a $15,000 loan from her mother for a lunch wagon which she never saw and probably did not exist, money which was probably used to buy drugs for sale.  (Id.)

The jury deliberated for about one full day and found all three defendants guilty of two counts of kidnapping during a carjacking and one count of evading a police officer with reckless driving; they found Petitioner guilty of possession of a firearm by a felon and of being an occupant of a vehicle who allowed a concealed firearm to be in the vehicle.  (CT 810-13.)  The jury returned true findings on the sentence enhancement allegations that Martinez was personally armed with a handgun during the commission of the kidnapping during a carjacking counts, and that Petitioner and Oritz, although not personally armed with a firearm, were principals in the kidnapping during a carjacking counts and were vicariously liable for possession of a firearm.  (Id.)  Petitioner and Ortiz were sentenced to life in prison plus four years; Martinez was sentenced to life in prison plus ten years.  (RT 3431-36.)

/ / /

# IV.

## PETITIONER'S CLAIMS

(1)  Petitioner's federal Constitutional right to due process was violated because there was insufficient evidence to support the guilty verdict of kidnapping during a carjacking because there was insufficient evidence the kidnapping was done with the specific intent to facilitate the carjacking.  (FAP at 6, 52-71, 94-99.)

(2)  Petitioner's federal Constitutional right to due process was violated by the failure of the trial court to instruct the jury on the lesser included offense of simple kidnapping.  (FAP at 7, 34-52.)

(3)  Petitioner's federal Constitutional right to due process was violated because the trial court failed to instruct the jury that the offense of kidnapping during a carjacking requires that the purpose of the kidnapping must be to facilitate the carjacking, and that the offense is not committed if the carjacking is incidental to the kidnapping.  (FAP at 8.)

(4)  Petitioner's federal Constitutional right to due process was violated because the trial court failed to give the jury a unanimity instruction regarding the gun possession crimes and gun use allegations.  (FAP at 9.)

# V.

## DISCUSSION

For the following reasons the Court finds that the adjudication of Petitioner's claims by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  The Court also finds that any errors with respect to Claims 2 and 3 are harmless.   The Court therefore **RECOMMENDS** the First Amended Petition be **DENIED**.

**A.     Standard of Review.**

Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides, with respect to claims which were adjudicated on their merits in the state court,

that in order to obtain federal habeas relief, a petitioner must first demonstrate that the state court adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006).  Even if the petitioner can satisfy § 2254(d), or show that it does not apply, he still must show a federal constitutional violation occurred.  Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).  Petitioner must also demonstrate that any constitutional error is not harmless, unless it is of the type included on the Supreme Court's "short, purposely limited roster of structural errors." Gautt v. Lewis, 489 F.3d 993, 1015 (9th Cir. 2007), citing Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (recognizing that "most constitutional errors can be harmless.")

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407.  Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, 103 (2011).

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions as of time of the relevant state-court decision." Williams, 529 U.S. at 412. To satisfy § 2254(d)(2), a petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. The Supreme Court has stated that "[i]f this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents." Id. at 102-03 ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.") (internal quotation marks omitted).

**B.     Claim 1**

Petitioner contends in Claim 1 that his federal Constitutional right to due process was violated because there was insufficient evidence to establish the kidnapping was done in order to facilitate the carjacking as required for the offense of kidnapping during a carjacking. (FAP at 6, 52-71.) He argues that the evidence showed that kidnapping Castrillon and Arellano was the criminal objective, and the BMW was merely the vehicle used to transport them. He argues the carjacking was therefore merely incidental to the kidnapping, and the kidnapping was not committed in order to facilitate a carjacking as required by California law. (Id. at 53-54.)

Respondent answers that the appellate court correctly and reasonably applied controlling principles of federal law to find that sufficient evidence was presented for the jury to find that the defendants kidnapped the victims with the intent of facilitating the carjacking because the jury could have found the defendants kidnapped the victims for the dual purpose of taking the valuable late-model BMW to keep or sell as partial payment of the drug debt, and taking the victims and holding them for ransom to satisfy Castrillon's drug debt, particularly Arellano who was wealthy and had wealthy parents. (Ans. Mem. at 25-26.)

Petitioner presented Claim 1 to the state supreme court in a petition for review of the appellate court opinion affirming his convictions. (Lodgment Nos. 14-15.) The state supreme court summarily denied the petition without citation of authority or a statement of reasoning. (Lodgment No. 16.) Petitioner presented the same claim to the state appellate court. (Lodgment Nos. 3-4.) That court denied the claim on its merits. (Lodgment No. 12.)

In Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991), the Court adopted a presumption which gives no effect to unexplained state court orders but "looks through" them to the last reasoned state court decision. The Court will look through the silent denial of Claim 1 by the state supreme court to the appellate court opinion, which stated:

> Defendants contend there is insufficient evidence to support their convictions of counts 1 and 2. They argue there was no evidence showing they kidnapped Castrillon and Arellano to facilitate the carjacking.

> A

> When an appellant challenges a criminal conviction based on a claim of insufficiency of the evidence, "the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. (Citation.) Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

The substantial evidence standard of review involves two steps. "First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences. (Citation.)   Second, one must determine whether the evidence thus marshaled is substantial.   While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence (citation), this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . (Citation.) '(I)f the word "substantial" (is to mean) anything at all, it clearly implies that such evidence must be of ponderable legal significance.   Obviously the word cannot be deemed synonymous with "any" evidence.   It must be reasonable . . . , credible, and of solid value. . . .'   (Citation.)   The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record."   (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632–1633, fns. omitted.)   "(T)he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.   *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*"   (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 (*Bowers* ).)

## B

Section 209.5 defines the offense of kidnapping during a carjacking:

"(a) Any person, who, during the commission of a carjacking and *in order to facilitate the commission of the carjacking, kidnaps another person* who is not a principal in the commission of the carjacking shall be punished by imprisonment in the state prison for life with the possibility of parole.

"(b) This section shall only apply if the movement of the victim is beyond that merely incidental to the commission of the carjacking, the victim is moved a substantial distance from the vicinity of the carjacking, and the movement of the victim increases the risk of harm to the victim over and above that necessarily present in the crime of carjacking itself. . . ." (Italics added.)

The trial court instructed on counts 1 and 2 (kidnapping during a carjacking) with CALCRIM No. 1204 as follows:

"The defendants are charged in Counts 1 and 2 with kidnapping during a carjacking.   To prove the defendant is guilty of this crime, the People must prove that:

"(One,) (t)he defendant committed a carjacking;

"Two, during the carjacking, the defendant took, held, (or) detained another person by using force or by instilling

reasonable fear;

"Three, the defendant moved the other person or made that person move a substantial distance from the vicinity of the carjacking;

"Four, the defendant *moved or caused the other person to move with the intent to facilitate the carjacking* or to help himself escape or to prevent the other person from sounding an alarm;

"Five, the person moved was not one of the carjackers;

"(S)ix, the other person did not consent to the movement;

"And, . . . seven, the defendant did not actually and reasonably believe the other person consented to the moving. (¶) . . . (¶)

"To decide whether the defendant committed carjacking, please refer to separate instructions I will now give you on that crime.

"As used here, substantial distance means more than slight or trivial distance. The movement must have been more than merely brief and incidental to the commission of the carjacking. The movement must have substantially increased the risk of physical or psychological harm to the person beyond that necessarily present in carjacking.

"In deciding whether the movement was sufficient, consider all the circumstances related to the movement. . . ." (Italics added.)

The court also instructed on the offense of carjacking with CALCRIM No. 1650 as follows:

"To prove a carjacking, the People must prove that:

"One, the defendant took a motor vehicle that was not his own;

"Two, the vehicle was taken from the immediate presence of the person who possessed the vehicle or was its passenger;

"Three, the vehicle was taken against the person's will;

"Four, the (defendant) used force or fear to take the vehicle or to prevent that person from resisting;

"And five, when the defendant used force or fear to take the vehicle, he intended to deprive the other person of possession of the vehicle either temporarily or permanently.

"The defendant's intent to take the vehicle must have been formed before or during the time he used force or fear.  If the defendant did not form this required intent until after using the force or fear, then he did not commit carjacking.  A person

takes something when he or she gains possession of it and moves it some distance. The distance moved may be short. . . .”

The intent that the kidnapping facilitate the carjacking must be present when the original asportation began.  (Cf. *People v. Laursen* (1972) 8 Cal.3d 192, 198 (“the rule that a (kidnapping) in which a robbery occurs does not constitute (kidnapping) for the purpose of robbery (under § 209) unless the specific intention to rob is present at the time of the original asportation.”).)  “Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense.”  (*People v. Pre* (2004) 117 Cal.App.4th 413, 420; see also *People v. Beeman* (1984) 35 Cal.3d 547, 558–559.)

## C

We conclude there is substantial evidence to support Defendants’ convictions of counts 1 and 2.  The jury could reasonably infer from all the evidence that Defendants kidnapped Castrillon and Arellano to facilitate the carjacking.  (§ 209.5; CALCRIM No. 1204.)  Undisputed evidence showed that Defendants quickly jumped out of the Lincoln Navigator, pushed Castrillon and Arellano back into the BMW, and drove the BMW away with Castrillon and Arellano held captive inside.

Defendants do not dispute there is substantial evidence to support findings that they committed both the kidnapping and carjacking offenses, but argue there is insufficient evidence to support a finding they kidnapped Castrillon and Arellano to facilitate the carjacking.  However, we conclude the jury could reasonably infer from the circumstances that Defendants kidnapped Castrillon and Arellano for the dual purposes of taking the victims (Castrillon and Arellano) *and* taking the BMW.  Because Castrillon owed a large drug debt (i.e., $70,000 to $100,000) to Jasso and Galarza, the jury could reasonably infer Defendants took the 2007 530i BMW with the intent to hold or sell it as partial payment of that drug debt.  Although, as Defendants argue, there was no evidence presented by the People regarding the current market value of the BMW, the jurors could rely on their common knowledge that late-model BMW’s have a substantial market value.  Contrary to Defendants’ argument, that inference by the jurors was not mere speculation, but was instead reasonably based on common knowledge regarding the value of late-model BMW’s.  Furthermore, assuming arguendo one of the purposes, if not the primary purpose, of the kidnappings was to kidnap and hold Castrillon and Arellano (e.g., for ransom that would be credited toward Castrillon’s drug debt), that other purpose does not disprove that another purpose of the kidnappings was to facilitate the carjacking.  Defendants do not cite any cases holding, nor are we persuaded, that the sole, or primary, intent of a section 209.5 offense must be to facilitate a carjacking.  Rather, based on the plain language of section 209.5, we believe that offense requires there be *an* intent that the kidnapping facilitate a carjacking, even if there are other concurrent intents for the kidnapping.  To the extent Defendants cite evidence or inferences that would have supported a contrary finding regarding their intent in committing the kidnappings (e.g., that their sole criminal purpose was to kidnap Castrillon and Arellano to pay the drug debt, the carjacking was merely incidental to the kidnapping, or vice versa), they misconstrue and/or misapply the substantial evidence standard of review.  [FN3] (*People v. Rodriguez, supra*, 20 Cal.4th at p. 11; *People v. Johnson, supra*, 26 Cal.3d

at p. 578; *People v. Young, supra*, 34 Cal.4th at p. 1181; *Kuhn v. Department of General Services, supra*, 22 Cal.App.4th at pp. 1632–1633; *Bowers, supra*, 150 Cal.App.3d at pp. 873–874.)

> FN3.  The fact the prosecutor argued in closing that the evidence showed Defendants intended to kidnap Castrillon and Arellano to pay for his drug debt did not preclude the jury from reasonably inferring one of Defendants' intents for the kidnappings was to facilitate the carjacking.

<u>People v. Ortiz, et al.</u>, 208 Cal.App.4th at 1362-66.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  The Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979).  Federal habeas courts must analyze <u>Jackson</u> claims "with explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Id.</u> at 324 n.16; <u>see also</u> <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) (holding that "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.")  The Court must "apply the standards of <u>Jackson</u> with an additional layer of deference" when AEDPA applies, and can only grant relief if the state court's decision was objectively unreasonable.  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  The Court must ask whether the appellate court's decision "reflected an unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of this case." <u>Id.</u> at 1275.

Petitioner contends he did not intend to carjack the BMW, but merely intended to kidnap the victims.  In the First Amended Petition he states:

> The defendant did not move or caused the other person to move with the intent to facilitate the carjacking.  The intent was to kidnap Joshua Arellano [sic] due to a bad drug deal gone wrong.  Defendant was hired from an outside source to kidnap Joshua Arellano [sic].  Before this incident defendant did not know Joshua Arellano [sic], Daniel Jasso or Arturo Galarza.  Defendant had never been in contact with any of the three above mentioned until that day.

(FAP at 8.)

Despite Petitioner's present disclosure that his subjective intent was merely to kidnap the victims, the evidence presented at trial allowed the jury to draw a reasonable inference that he also intended to facilitate the carjacking by kidnapping the victims. As the state court found, by taking the victims in their BMW rather than leaving them on the sidewalk to call the police, Petitioner prevented them from raising an alarm. That finding is supported by Arellano's testimony that someone in the back seat, where Petitioner was seated, immediately demanded her cell phone to ensure she did not call anyone. Had Petitioner left the victims on the sidewalk, they could have gone into the restaurant and called the police. In fact, the evidence supports a finding that kidnapping the victims might have ensured a successful carjacking but for the fortuitous observation by the owner of the Big Kahuna restaurant and his 911 call, which he placed mere seconds before the victims could have run into the restaurant and asked him to place the call had they not been kidnapped. Evidence that they did not know the police had been notified by the restaurant owner included Officer Spetter's testimony that they were calmly waiting at a traffic light a few blocks away a few minutes later. Had kidnapping been their only intent, the defendants could have placed the victims in the SUV rather than forcing them back into the BMW. As the SUV pulled up immediately after the BMW stopped, it had presumably followed them from their home, and the victims could have been kidnapped there. Petitioner is correct that there was sufficient evidence the victims were kidnapped as a result of Castrillon's admitted drug debt to a dangerous Mexican drug cartel, particularly Detective Brown's testimony that kidnapping for ransom by drug cartels was popular at that time, but that does not mean there was insufficient evidence that the defendants also intended to carjack the BMW as partial payment for the debt and to facilitate the carjacking by kidnapping the victims to prevent them from calling the police. See People v. Perez, 84 Cal.App.4th 856, 860-61 (2000) ("[I]f there is substantial evidence that appellant intended the kidnapping to effect an escape or prevent an alarm from being sounded, his conviction for kidnapping during the commission of a carjacking must stand.")

The Court must analyze Petitioner's claim by explicit reference to state law, in particular the appellate court's finding that the elements of the offense of kidnapping for the purpose of carjacking are satisfied if there is sufficient evidence of intent to facilitate the carjacking by kidnapping the victims. Jackson, 443 U.S. at 324 n.16; Bradshaw, 546 U.S. at 76. The state appellate court correctly found sufficient evidence existed to show that kidnapping the victims facilitated the carjacking by preventing the victims from raising an alarm. The fact that the jury could draw other reasonable inferences regarding the defendants' intent does not mean the jury could not draw the reasonable inference identified by the state appellate court.

Considering the additional layer of deference a federal habeas court is required under AEDPA to give over and above the deference required by Jackson, this Court cannot say that the appellate court's opinion involved an objectively unreasonable application of Jackson and Winship. Juan H., 408 F.3d at 1275; Coleman v. Johnson, 566 U.S. ___, 132 S.Ct. 2060, 2065 (2012) ("The jury in this case was convinced, and the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality."); see also Richter, 562 U.S. at 102-03 ("If this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents. . . . and reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.") Thus, addressing the claim with explicit reference to state law as interpreted by the appellate court, and resolving any conflicts regarding whether the jury made the proper findings in favor of the verdict, as this Court must, it is clear that sufficient evidence was presented at trial to support the convictions. Applying the doubly deferential standard of review necessitated by AEDPA, the Court finds that the state court adjudication of this claim was neither contrary to, nor involved an unreasonable application of, Jackson or Winship, and was not based on an unreasonable determination of the facts. Woodall, 134 S.Ct. at 1706-07;

<u>Richter</u>, 562 U.S. 102-03; <u>Bradshaw</u>, 546 U.S. at 76; <u>Andrade</u>, 538 U.S. at 75-76; <u>Miller-El</u>, 537 U.S. at 340; <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Winship</u>, 397 U.S. at 364; <u>Juan H.</u>, 408 F.3d at 1275.  The Court therefore **RECOMMENDS** that habeas relief be **DENIED** as to Claim 1.

## C.   Claim 2

Petitioner contends in Claim 2 that his federal Constitutional right to due process was violated by the failure of the trial court to instruct the jury that simple kidnapping is a lesser included offense of kidnapping for the purpose of carjacking.  (FAP at 7, 34-52.) Petitioner argues that although the trial court instructed the jury that carjacking and felony false imprisonment were lesser included offenses of kidnapping for the purpose of carjacking, the trial judge erroneously ruled that simple kidnapping is not a lesser included offense.  (<u>Id.</u> at 34.)

Respondent answers that this is not a cognizable federal habeas claim because it relies solely on an interpretation of state law.  (Ans. Mem. at 27.)  Respondent also argues that the United States Supreme Court has never found that a failure to instruct on a lesser included offense in a non-capital case violates the federal Constitution, and therefore Petitioner cannot demonstrate that the denial of this claim by the state court was contrary to clearly established federal law.  (<u>Id.</u>)  Finally, Respondent argues that the claim fails on the merits because a lesser included offense instruction is only appropriate where the evidence warrants one, and the state appellate court here correctly found there was insufficient evidence the defendants were guilty of simple kidnapping.  (<u>Id.</u> at 27-32.)

The Court will look through the silent denial of Claim 2 by the state supreme court to the state appellate court's opinion.  <u>Ylst</u>, 501 U.S. at 804.  The appellate court stated:

> Defendants contend the trial court erred by not instructing on simple kidnapping as a lesser included offense (LIO) of kidnapping during a carjacking.

> A

> As discussed above, the trial court instructed with CALCRIM No. 1204 on the section 209.5 offense of kidnapping during a carjacking as charged in counts 1 and 2.  It also instructed on the LIO's of carjacking and

felony false imprisonment.  [FN4]  The court refused Defendants' request for an instruction on simple kidnapping as an LIO of kidnapping during a carjacking.  The jury found Defendants guilty of both counts of kidnapping during a carjacking (counts 1 and 2).

> FN4.  The trial court instructed on felony false imprisonment with CALCRIM No. 1240 as follows: "False imprisonment by violence or menace is a lesser included offense of kidnapping during the commission of a carjacking.  To prove the defendant is guilty of this crime, the People must prove that:  (¶)  The defendant intentionally and unlawfully confined or detained someone or caused that person to be restrained or confined or detained by violence or menace; and the defendant made the other person stay or go somewhere against that person's will. . . ."

## B

"The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense." (*People v. Cooper* (1991) 53 Cal.3d 771, 827.)  An instruction on an LIO is not required when there is no evidence to support a finding that the LIO was committed.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154   (*Breverman*).)  Alternatively stated, "a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence.  On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support."  (*Id.* at p. 162.)  "(A) trial court is not required to instruct the jury as to all lesser included offenses, only those that 'find substantial support in the evidence.'"  (*People v. Medina* (2007) 41 Cal.4th 685, 700 (*Medina*).)  In determining whether a trial court erred in not giving a simple kidnapping LIO instruction, we consider whether there was substantial evidence to support a verdict on that LIO.  (*Ibid.*; *Breverman*, at p. 162.)  "It is error . . . to instruct on a lesser included offense when a defendant, if guilty at all, could only be guilty of the greater offense, i.e., when the evidence, even construed most favorably to the defendant, would not support a finding of guilt of the lesser included offense but would support a finding of guilt of the offense charged."  (*People v. Stewart* (2000) 77 Cal.App.4th 785, 795–796 (*Stewart* ).)

"Under California law, a lesser offense is necessarily included in a greater offense if . . . the statutory elements of the greater offense . . . include all the elements of the lesser offense, such that the greater offense cannot be committed without also committing the lesser."  (*People v. Birks* (1998) 19 Cal.4th 108, 117.)

In a noncapital case, the *Watson* standard of prejudice applies when considering a trial court's error in failing to instruct on an LIO supported by substantial evidence.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Breverman*, *supra*, 19 Cal.4th at p. 178.)  We reverse only if, after examining the entire record, we conclude it is reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred.  (*Watson*, at p. 836; *Stewart, supra*, 77 Cal.App.4th at p. 796.)

13cv2961

C

We conclude the trial court did not err by not instructing on simple kidnapping as an LIO of kidnapping during a carjacking. "Generally, to prove the crime of (simple) kidnapping, the prosecution must prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance. (§ 207, subd. (a).)" (*People v. Jones* (2003) 108 Cal.App.4th 455, 462, fn. omitted.)  Those elements appear to be included within the elements of kidnapping during a carjacking. (§ 209.5; CALCRIM No. 1204.)  Assuming arguendo simple kidnapping meets the elements test and is therefore an LIO of kidnapping during a carjacking, we nevertheless conclude the trial court did not err by failing to instruct on simple kidnapping because there is insufficient evidence in the record to support a verdict finding Defendants guilty of simple kidnapping rather than kidnapping during a carjacking. (*Medina, supra*, 41 Cal.4th at p. 700; *Breverman, supra*, 19 Cal.4th at p. 162; *Stewart, supra*, 77 Cal.App.4th at pp. 795–796.)

The undisputed evidence shows that as Castrillon and Arellano were beginning to step out of the BMW, Defendants quickly jumped out of the Lincoln Navigator, pushed Castrillon and Arellano back into the BMW, and drove away with them inside.  There can be no doubt the kidnappings occurred during a carjacking.  The kidnappings did not occur before the carjacking, but rather were simultaneous with and during the carjacking. Furthermore, there was an absence of substantial evidence to support a reasonable inference that the kidnappings were not done to facilitate the carjacking.  Rather, as discussed above, there is substantial, if not overwhelming, evidence to support a reasonable inference that Defendants kidnapped Castrillon and Arellano to facilitate the carjacking.

Contrary to Defendants' assertion, it cannot be reasonably inferred from the evidence that Defendants' sole purpose in kidnapping Castrillon and Arellano was to hold them for ransom to pay the drug debt and that facilitation of the carjacking was not one of their purposes. Defendants took both the victims and their car at the same time.  Therefore, it could only be reasonably inferred that if Defendants were guilty of any offense involving the carjacking, it was kidnapping during a carjacking and not simple kidnapping (i.e., without a purpose of facilitating the carjacking).  (Cf. *Medina, supra*, 41 Cal.4th at p. 700 ("In this case, there was no substantial evidence that the offense committed was less than that charged.  As the Court of Appeal majority concluded: 'If the jury found that (defendant) intended to kidnap the Perez family, it must have also found that he intended to carjack, as he was running from the police and jumped into the van and attempted to start it, knowing the Perez family was inside. . . .  There was no evidence he intended only one of those offenses (i.e., carjacking or kidnapping) and not the other, or, under the facts, he would have committed only one.'").)  Because there is insufficient evidence to support a verdict finding Defendants guilty of only simple kidnapping, the trial court did not err by not instructing on simple kidnapping as an LIO of kidnapping during a carjacking.

D

Assuming arguendo the trial court erred by failing to instruct on simple kidnapping as an LIO of kidnapping during a carjacking, we

nevertheless would conclude that error was harmless under the *Watson* standard of prejudice. (*Breverman, supra*, 19 Cal.4th at p. 178; *People v. Watson, supra*, 46 Cal.2d at p. 836; *Stewart, supra*, 77 Cal.App.4th at p. 796.) Based on our review of the entire record, it appears highly unlikely the jury would have convicted Defendants of simple kidnapping instead of the greater offense of kidnapping during a carjacking. The jury was instructed on, and rejected, the LIO's of carjacking and false imprisonment and instead convicted Defendants of the greater offense of kidnapping during a carjacking. Because the jury rejected those LIO's, we believe it is highly unlikely, given the egregious factual circumstances in this case, the jury would have found Defendants guilty of simple kidnapping rather than the greater offense of kidnapping during a carjacking. It is not reasonably probable Defendants would have obtained a more favorable outcome had the trial court instructed on simple kidnapping as an LIO of kidnapping during a carjacking. Therefore, any error in failing to instruct on simple kidnapping was not prejudicial. (*Breverman*, at p. 178; *Watson*, at p. 836; *Stewart*, at p. 796.)

People v. Ortiz, et al., 208 Cal.App.4th at 1366-69.

"[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." Windham v. Merkle, 163 F.3d 1092, 1105-06 (9th Cir. 1998); see also Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984) ("Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."), quoting James v. Reese, 546 F.2d 325, 327 (9th Cir. 1976). Nevertheless, the Ninth Circuit has recognized that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established United States Supreme Court precedent. Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (emphasis added); Bashor, 730 F.2d at 1240 ("This general statement may not apply to every habeas corpus review, because the criminal defendant is also entitled to adequate instruction on his or her theory of defense."); Bradley v. Duncan, 315 F.3d 1091, 1098-1101 (9th Cir. 2002) (finding federal due process violation in a post-AEDPA habeas case where a request for instruction on the only theory of defense was denied.); United States v. Fejes, 232 F.3d 696, 702 (9th Cir. 2000) ("A defendant is entitled to have the judge instruct the jury on his theory of defense provided it is supported by law and has some foundation in the evidence.")

Petitioner has not demonstrated that an instruction on the lesser included offense of simple kidnapping was necessary to his theory of defense. Petitioner's defense was that there was no kidnapping or carjacking, as the defendants were merely escorting Castrillon and Arellano to complete the drug deal, and/or that the kidnapping and carjacking were a ruse, as Castrillon, and perhaps Arellano, were complicit in a plot to extort money from Arellano's wealthy parents under the guise of a kidnapping. Petitioner instead argues that simple kidnapping would be a fair verdict, as he did in his post-trial motion to reduce the two kidnapping for the purpose of carjacking counts to simple kidnapping. (RT 2709-12, 3415-19.) At sentencing, the defense indicated they had been willing before trial to plead guilty to simple kidnapping, and would have done so but for the prosecution's refusal to negotiate. (RT 3421.) The trial judge stated that the crime was conducted in an unprofessional manner, and even indicated that: "I don't want to be flip about this, but, you know, Larry, Curly and Moe came to mind when they were doing this particular operation because of its lack of professionalism. They were terrible." (RT 3426.) The trial judge also noted that if the defendants had simply taken Castrillon away in the SUV, or had kidnapped him from his house, rather than take him and Arellano away in the BMW, they would have been facing eight years in prison on each count rather than a life sentence. (RT 3434.) Although Petitioner argues it is unfair that Galarza and Jasso were allowed to plead guilty prior to trial to simple kidnapping and receive sentences of only thirteen years, those men did not carjack the victims at gunpoint, as did Petitioner and his co-defendants. In any case, in imposing a life sentence, the trial judge considered sentence parity with the 13-year sentences given to Galarza and Jasso, "the shot-callers" as he referred to them, and took into consideration the prosecution's refusal to negotiate a plea, but chose a life sentence rather than probation (the only other sentencing option available), due to the terrifying experience for the innocent victim Arellano and the people on the freeway, opining that it was "an absolute miracle" no one was killed or injured. (RT 3430-34.)

/ / /

Thus, although Petitioner has shown that a conviction on simple kidnapping was a desirable outcome for him, and one he probably would have chosen before trial had he been given the option, he has not shown that the failure to instruct the jury on simple kidnapping as a lesser included offense of kidnapping for the purpose of a carjacking prevented him from presenting a defense, and has not shown that such an instruction was supported by state law or the evidence.  As the appellate court noted, the evidence overwhelmingly supported the jury's finding that the kidnapping was done to facilitate the carjacking did not support a simple kidnapping charge.  The defendants could have taken the victims in the SUV, or kidnapped them at their home, if kidnapping had been their only purpose, rather than carjacking them by forcing them back into their car at gunpoint and driving them away in the late-model BMW, the value of which represented a significant portion of Castrillon's drug debt.  That determination was neither contrary to, nor involves an unreasonable application of, clearly established federal law providing for instruction on lesser included offenses which are necessary to the theory of defense and have some foundation in the law and evidence.  Bashor, 730 F.2d at 1240; Bradley, 315 F.3d at 1098-1101.  Neither is it based on an unreasonable determination of the facts.  Woodall, 134 S.Ct. at 1706-07; Miller-El, 537 U.S. at 340.

Moreover, the Court finds that any error is harmless because the failure to instruct on the lesser included offense of simple kidnapping could not have had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  The Brecht standard "protects the State's sovereign interest in punishing offenders and its good-faith attempts to honor constitutional rights . . . while insuring that the extraordinary remedy of habeas corpus is available to those whom society has grievously wronged."  Calderon v. Coleman, 525 U.S. 141, 145 (1998) (internal citations and quotation marks omitted).  "Under this standard, an error is harmless unless the 'record review leaves the conscientious judge in grave doubt about the likely effect of an error . . . (i.e.,) that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'"

Padilla v. Terhune, 309 F.3d 614, 621-22 (9th Cir. 2002), quoting O'Neal v. McAninch, 513 U.S. 432, 435 (1995) and citing Kotteakos v. United States, 328 U.S. 750, 765 (1946) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.")

As the appellate court found, the jury was instructed that carjacking and felony false imprisonment were lesser included offenses of kidnapping during a carjacking, and the jury still convicted on the greater offense. In addition, there was overwhelming evidence that the defendants kidnapped the victims for the purpose of a carjacking. Despite Petitioner's subjective belief that kidnapping in response to Castrillon's drug debt was their only intention, and that the carjacking was merely incidental, the appellate court correctly observed that there was substantial evidence that carjacking was also a primary intent of the defendants because the value of the late-model BMW would have gone a long way toward satisfying Castrillon's drug debt, and because the defendants did not need to take the BMW if they only wanted to kidnap the victims for ransom. Given that evidence, along with the rejection of the other lesser included offenses, and the fact that sufficient evidence was presented for the jury to draw a reasonable inference that the kidnapping facilitated the carjacking by preventing the victims from calling the police, the Court is not in grave doubt the jury would have found the defendants guilty of simple kidnapping had they been instructed that simple kidnapping is a lesser included offense of kidnapping during a carjacking. O'Neal, 513 U.S. at 435; Kotteakos, 328 U.S. at 765.

The Court finds that the appellate court's adjudication of Claim 2 is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court also finds that any error is harmless. The Court therefore **RECOMMENDS** that habeas relief be **DENIED** as to Claim 2.

/ / /

**D.      Claim 3**

Petitioner contends in Claim 3 that his federal Constitutional rights to due process and a fair trial were violated because the trial court failed to instruct the jury that the offense of kidnapping during a carjacking requires that the purpose of the kidnapping was to facilitate a carjacking, and the offense is not committed if the carjacking is merely incidental to the kidnapping.  (Pet. at 8.)  Petitioner states that he was hired to kidnap Castrillon "due to a bad drug deal gone wrong," and he had no intent to carjack the victims.  (Id.)

Respondent answers that this claim is not cognizable on federal habeas because it relies only on an interpretation of state law.  (Ans. Mem. at 32.)  Respondent also contends that to the extent it presents a federal claim, clearly established federal law provides that a federal due process violation can only be shown if there is a reasonable likelihood the instructions violated the federal Constitution, such as relieving the jury of finding an element of the offense or altering the burden of proof.  (Id. at 32-35.)  Respondent argues that the denial of the claim by the state appellate court, on the basis that the jury was adequately instructed on the elements of the offense, and the clarifying instruction was not an accurate statement of California law, is neither contrary to, nor involves an unreasonable application of, that clearly established federal law.  (Id.)

The Court will look through the silent denial of Claim 3 by the state supreme court to the state appellate court's opinion.  Ylst, 501 U.S. at 804.  The appellate court stated:

> Defendants contend the trial court erred by instructing with CALCRIM No. 1204 on counts 1 and 2.  They argue the court should have instructed the offense of kidnapping during a carjacking requires that the purpose of the kidnapping was to facilitate a carjacking and, in addition, that the offense is not committed if the carjacking is merely incidental to the kidnapping.
>
> We conclude the trial court properly instructed the jury with CALCRIM No. 1204 on the offense of kidnapping during a carjacking.  As quoted above, the jury was instructed one of the elements of that offense was that "(t)he defendant *moved or caused the other person to move with the intent to facilitate the carjacking*. . . ." (Italics added.) That instruction adequately instructed the jury of the requirement that the kidnapping be done to facilitate the carjacking.  (§ 209.5.) Defendants do not cite any case holding, nor are we persuaded, section 209.5 requires that the sole or primary purpose of the kidnapping be to facilitate the carjacking.  Rather,

it is sufficient if at least one of the intents or purposes of the kidnapping is to facilitate the carjacking.

Likewise, Defendants do not cite any case holding, and we are not persuaded, the trial court must instruct sua sponte that a section 209.5 offense is not committed if the carjacking is merely incidental to the kidnapping. Rather, the trial court's instruction with CALCRIM No. 1204 clearly sets forth all the elements of a section 209.5 offense, including the requirement that the kidnapping be done to facilitate the carjacking. To the extent Defendants assert the court should also have instructed the carjacking must be more than incidental to the kidnapping, we are not persuaded that instruction would be an accurate statement of the law. In any event, that instruction was not required to be given sua sponte and, because Defendants did not request such a clarifying or amplifying modification of CALCRIM No. 1204, they waived any purported instructional error. (*People v. Mace* (2011) 198 Cal.App.4th 875, 882; *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1026; *People v. Andrews* (1989) 49 Cal.3d 200, 218; *People v. Estrada* (1995) 11 Cal.4th 568, 574.)

We also reject Defendants' assertion that the prosecutor's closing argument "invited the jury to convict (them) solely on the basis of a kidnapping simultaneously with a carjacking, without regard for the purpose of the kidnapping. . . ." The trial court instructed the jury: "You must follow the law as I explain it to you (e.g., CALCRIM No. 1204), even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Absent affirmative evidence showing otherwise, we presume the jury followed the court's instructions. Therefore, to the extent the prosecutor may have misstated or inaccurately described applicable law, we conclude the jury ignored any such erroneous statements by the prosecutor and instead followed the trial court's instructions (e.g., CALCRIM No. 1204). Likewise, we reject Defendants' assertion that the jury was misled by the title of CALCRIM No. 1204 (i.e., "1204. KIDNAPPING DURING CARJACKING"). Absent affirmative evidence showing otherwise, we conclude the jury followed the substance of CALCRIM No. 1204's provisions and not its title, which presumably is truncated for purposes of convenience.

People v. Ortiz, et al., 208 Cal.App.4th at 1369-70.

Respondent argues that Petitioner is not entitled to relief because federal habeas relief is not available for an alleged error in the application or interpretation of state law. See Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.") However, "[t]he issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).

In order to show a federal due process violation arising from a failure to instruct, Petitioner must demonstrate that the failure to give the instruction "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72, quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973).  In addition, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.

Petitioner has not shown that a federal due process violation resulted from the failure to instruct the jury that in order to establish kidnapping during a carjacking the carjacking must be more than incidental to the kidnapping.  As the appellate court noted, the jury was properly instructed on the elements of the offense of kidnapping during a carjacking, and the further instruction may not have been a proper expression of California law.  In any case, as discussed above in Claims 1 and 2, there was, as the appellate court put it, "substantial if not overwhelming evidence" that the defendants kidnapped the victims in order to facilitate the carjacking.  The defendants had the choice of taking the victims with them in the SUV, or perhaps kidnapping them at their home, but decided to force them back into the BMW at gunpoint and use that car for the kidnapping, thereby carjacking the victims in the process.  There was evidence presented, in the form of Detective Brown's testimony, that kidnapping for ransom by drug cartels was on the rise at the time of this offense.  Petitioner argues that such evidence supports his position that kidnapping for the purpose of ransom due to the drug debt was their primary criminal intent, and that it is merely supposition that the late-model BMW could have been carjacked because it had a value sufficient to satisfy a significant portion of the driver's drug debt.  Nevertheless, there was sufficient evidence presented for the jury to find that the kidnapping was not incidental to the carjacking because it facilitated the carjacking by preventing the victims from sounding an alarm.  Thus, Petitioner has not shown that the failure to give the instruction (informing the jury that the carjacking must be more than incidental to the kidnapping), which may not have been an accurate

statement of California law, "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147. The Court finds that the state court rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and did not involve an unreasonable determination of the facts. Woodall, 134 S.Ct. at 1706-07; Richter, 562 U.S. at 102-03; Bradshaw, 546 U.S. at 76; Andrade, 538 U.S. at 75-76; Miller-El, 537 U.S. at 340; McGuire, 502 U.S. at 72; Cupp, 414 U.S. at 147.

Furthermore, any possible error is clearly harmless. As set forth above, the jury was properly instructed on the elements of kidnapping for the purpose of carjacking, and even if they had been further instructed that the carjacking must be more than incidental to the kidnapping, there was overwhelming evidence that the carjacking was more than incidental. The jury could have reasonably determined that the kidnappers wanted possession of the BMW to satisfy the drug debt, and by taking the victims with them they prevented them from calling the police, thereby facilitating the carjacking. Given that evidence, and the evidence that the defendants could have kidnapped the victims at their home or taken them away in the SUV, there is no indication in the record the jury would have found Petitioner not guilty of kidnapping for the purpose of carjacking if they had been instructed in the manner now asserted by Petitioner. Thus, the alleged instructional error here could not have had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

The Court finds that the appellate court's adjudication of Claim 3 is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court also finds that any error is harmless. The Court therefore **RECOMMENDS** that habeas relief be **DENIED** as to Claim 3.

**E.    Claim 4**

Petitioner contends in his final claim that his federal Constitutional right to due process was denied by the failure of the trial court to give a unanimity instruction

regarding the firearm possession counts and firearm use allegations. (Pet. at 9.) He argues that the prosecutor attempted to prove that Petitioner either actually or constructively possessed a stun gun, which under California law is considered a firearm, or a handgun, or constructively possessed a handgun used by a co-defendant, and the jury may have returned guilty verdicts without agreeing unanimously on a specific act or theory of possession. (Id.)

Respondent answers that this claim is not cognizable on federal habeas, but that even if it is, a unanimity instruction was not necessary because clearly established federal law provides that a jury is not required to reach a unanimous decision with regard to which overt act or admission satisfies the actus reus requirement for the charged offense. (Ans. Mem. at 35.) Respondent argues that because Petitioner was charged with possession of a firearm by a felon and allowing a concealed firearm to be in a vehicle, and the sentence enhancement findings alleged he either possessed or constructively possessed a firearm during the continuous course of criminal conduct, it was not necessary for the jury to agree whether he had actual or constructive possession. (Id. at 39.) Thus, Respondent argues that the denial of the claim by the appellate court is neither contrary to, nor involves an unreasonable application of, clearly established federal law. (Id. at 35-40.)

The Court will look through the silent denial of Claim 3 by the state supreme court to the state appellate court's opinion. Ylst, 501 U.S. at 804. The appellate court stated:

> Quezada contends his convictions on counts 4 and 5 and his firearm enhancements for counts 1 and 2 must be reversed because the trial court did not give a unanimity instruction regarding the possible multiple acts of his firearm possession.
>
> A
>
> In a criminal case, a defendant has the constitutional right to a unanimous jury verdict. (Cal. Const., art. I, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) Furthermore, "the jury must agree unanimously the defendant is guilty of a specific crime." (*Russo*, at p. 1132.) "Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. (Citations.) (¶) This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even

though there is no single offense which all the jurors agree the defendant committed.'" (*Ibid.*)

However, "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Russo, supra*, 25 Cal.4th at p. 1132.) "It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of (a crime) as that offense is defined by statute, it need not decide unanimously by which theory he is guilty." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918.) *Russo* discussed examples of when there are multiple, discrete crimes requiring a unanimity instruction and when there is only one discrete crime based on multiple theories not requiring a unanimity instruction. (*Russo*, at pp. 1132–1133.) "(T)ypical examples include the rule that, to convict a defendant of first degree murder, the jury must unanimously agree on guilt of a specific murder but need not agree on a theory of premeditation or felony murder (citation), and the rule that the jury need not agree on whether the defendant was guilty as the direct perpetrator or as an aider and abettor as long as it agreed on a specific crime [citation]." (*Id.* at p. 1133.) Furthermore, "(n)ot only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. *Sometimes, . . . the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other.*" (*Santamaria*, at p. 919, italics added.)

B

The jury found Quezada guilty of count 4, possession of a firearm by a felon (§ 12021, subd. (a)(1)), and count 5, carrying a firearm in a vehicle (§ 12025, subd. (a)(3)). It also found true the allegations that in committing counts 1 and 2 Quezada, while not personally armed, was vicariously liable for possession of a firearm (§12022, subd. (a)(1)). The trial court did not give a unanimity instruction regarding the specific acts constituting counts 4 and 5 and the firearm enhancements to counts 1 and 2.

C

Quezada asserts the trial court erred by not instructing sua sponte that the jurors must unanimously agree on the specific acts constituting counts 4 and 5 and the firearm allegations related to counts 1 and 2. He argues that because the evidence was conflicting regarding his actual or constructive possession of a firearm, there were multiple discrete acts or crimes that could have constituted those counts and allegations. Furthermore, because the prosecutor did not expressly elect as to the specific act or crime constituting the charged offense or allegation and inform the jurors of their need to unanimously agree on a specific act or crime, he argues the trial court was required to instruct sua sponte on that unanimity requirement.

Without discussing in detail the evidence at trial, we generally agree with Quezada that there is evidence from which jurors could have reasonably inferred he either: (1) actually possessed a gun; (2) actually possessed a taser; (3) constructively possessed Martinez's gun; or (4)

constructively possessed Ortiz's taser.  [FN10]  However, as the People argue, those separate "acts" did not constitute multiple discrete crimes or firearm allegations, but rather multiple "theories" of a single discrete crime or allegation.  (*Russo, supra,* 25 Cal.4th at pp. 1132–1133; *People v. Santamaria, supra,* 8 Cal.4th at pp. 918–919.)  If the jurors unanimously agreed beyond a reasonable doubt that Quezada actually possessed a gun or taser, or constructively possessed a gun or taser, that agreement was constitutionally adequate for his convictions of the disputed counts and allegations.  The jurors were not required to unanimously agree on the particular act or acts he did in committing each of those single discrete crimes and allegations.  The jurors may not have unanimously agreed as to exactly what Quezada did (e.g., whether he actually or constructively possessed a firearm).  But such unanimous agreement is not required for a conviction or true finding.  Like the example of uncertainty regarding whether a defendant was the direct perpetrator or an aider and abettor, it is sufficient if the jurors unanimously agreed that Quezada did one or the other (actual or constructive possession of a gun or taser), either of which would constitute the single discrete crime or allegation (e.g., count 4, count 5, count 1 firearm allegation, and count 2 firearm allegation).  (*Russo,* at pp. 1132–1133; *Santamaria,* at pp. 918–919.)  During the continuous course of conduct involved in this case, the jury unanimously found Quezada guilty of the single discrete crimes charged in counts 4 and 5 and found true the firearm allegations related to counts 1 and 2.  The jurors were not required to unanimously agree on the particular theory regarding his acts constituting those single discrete crimes or allegations.  (Cf. *Russo,* at p. 1135; *Santamaria,* at p. 920.)  The trial court did not err by not giving a unanimity instruction.  [FN11]  *People v. Melhado* (1998) 60 Cal.App.4th 1529, cited by Quezada, is inapposite to this case and does not persuade us to reach a contrary conclusion.

> FN10.  For purposes of this opinion, we assume arguendo, as Quezada asserts, that a taser is a firearm within the meaning of the statutes involved herein. (See *People v. Heffner* (1977) 70 Cal.App.3d 643, 652–653.)

> FN11.  We further note the prosecutor was not required to elect one of those theories as constituting the single discrete crime or allegation and inform the jurors they must unanimously agree on that particular theory.  Nevertheless, the prosecutor apparently attempted to elect among those theories by arguing in closing that Quezada was vicariously liable for Martinez's possession of a firearm.

People v. Ortiz, et al., 208 Cal.App.4th at 1374-77.

It is clearly established that a state criminal defendant does not have a federal constitutional right to a unanimous jury verdict.  Apodaca v. Oregon, 406 U.S. 404, 406 (1972); Johnson v. Louisiana, 406 U.S. 356, 363 (1972).  Petitioner is therefore not entitled to federal habeas relief even if the jury did not reach a unanimous decision as to whether he possessed or constructively possessed a handgun or a stun gun.  Richter, 562

U.S. at 102-03; <u>Andrade</u>, 538 U.S. at 75-76.

However, as previously stated, Petitioner may still show a federal due process violation if he can demonstrate that the failure to give the instruction "so infected the entire trial that the resulting conviction violates due process." <u>McGuire</u>, 502 U.S. at 72, quoting <u>Cupp</u>, 414 U.S. at 147.  The appellate court found that a unanimity instruction was not necessary because the four discrete possibilities of possession (actual possession of a stun gun, actual possession of a handgun, constructive possession of a stun gun, and constructive possession of a handgun), were not separate criminal offenses, but merely different theories of how Petitioner committed the two gun possession crimes and the two firearm use enhancements.  The jury was instructed immediately before closing arguments that they were required to reach unanimous verdicts on each count and that each special finding must be unanimous.  (RT 2759-60.)  That was also the last instruction they received before beginning deliberations.  (RT 3044-45.)

There was overwhelming evidence presented at trial that Petitioner was armed, either actually or constructively, with a stun gun or handgun throughout the entire course of the crime.  Arellano testified that she heard the sound of a stun gun and felt a sting in her shoulder when she was slow in finding and turning over her cell phone.  A stun gun was found in the back seat of the BMW, and she identified Petitioner in court and at the curbside lineup as the person sitting directly behind her in possession of a stun gun. There was admittedly some confusion on her part as to whether Petitioner or Ortiz was armed with the stun gun, as she had reversed their order in the back seat when testifying at the preliminary hearing where she said that Ortiz had used the stun gun on her.  As a result, the prosecutor amended the Second Amended Information to change the firearm use enhancement from alleging Petitioner was actually armed to constructively armed. However, Arellano testified that Martinez, the driver, had a handgun in his hand when he first entered the BMW through the driver's door, and that he ordered Castrillon into the back seat at gunpoint.  She also testified that Martinez ordered her to open her window just before he threw a handgun out her window, and handguns were found on the

side of the road where Castrillon and Arellano said they had been thrown out of the BMW during the chase.  In light of that evidence, and because neither state nor federal law requires the jurors to unanimously agree as to whether Petitioner actually or constructively possessed a firearm or a stun gun in order to convict him of the two firearm possession counts and return true findings on the two firearm use enhancements, the failure to instruct the jury that they had to be unanimous in that regard could not have "so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.

Accordingly, the Court finds that the state court's adjudication of Claim 4 did not involve an unreasonable application of clearly established federal law. Richter, 562 U.S. at 102-03; Andrade, 538 U.S. at 75-76; Williams, 529 U.S. at 412; McGuire, 502 U.S. at 72; Cupp, 414 U.S. at 147.

## VI.

## CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that judgement be entered denying the Petition.

**IT IS ORDERED** that no later than **May 21, 2015** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **June 4, 2015**.  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  April 21, 2015

DAVID H. BARTICK
United States Magistrate Judge

13cv2961